Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5913 | **DATE** | 12/18/2002 |
| **CASE TITLE** | OSCAR AGUILERA vs. VILLAGE OF HAZEL CREST | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   Defendant's motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | DEC 19 2002 date docketed | |
| ✓ | Docketing to mail notices. | | | 26 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| EF | courtroom deputy's initials | 02 DEC 18 PM 4:59 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| OSCAR AGUILERA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 01 C 5913 |
| vs. ) | |
| ) | HONORABLE CHARLES R. NORGLE |
| VILLAGE OF HAZEL CREST, ) | |
| ) | |
| Defendant. ) | |

**DOCKETED**
**DEC 1 9 2002**

**OPINION AND ORDER**

CHARLES R. NORGLE, SR. District Judge

Before the court is Defendant's motion for summary judgment. For the following reasons, the motion is granted.

### I. BACKGROUND

Oscar Aguilera filed this suit claiming that the Village of Hazelcrest discriminated against him on the basis of race and national origin. Aguilera is an American born Hispanic male of Cuban-Mexican descent. In 1994, Aguilera applied to become a police officer in the Village of Hazelcrest ("the Village"). On November 14, 1994, the Village sent a letter to Aguilera, stating that he had successfully passed the Village's written examination to become a police officer. Shortly thereafter, Aguilera was interviewed and hired by then Police Chief Harold Moore.

Village policy requires newly hired inexperienced police officers to attend formal training at the Illinois State Police Academy. After successful completion of the Academy's training program, the officers report for a probationary training period with Village police officers. The Village's training period is a twelve week field training program that has several layers of training officers.



During field training, probationary officers work one on one with an experienced officer, and will do so with three different officers during the twelve week program. The training officers, in turn, report to the field training coordinator, who is a sergeant and is responsible for managing the day to day activities of the field training program. The coordinator reports to a lieutenant, who serves as the training officer for the entire police department, and is responsible for all officer training.

Aguilera entered the Illinois State Police Academy on January 15, 1995, and successfully graduated March 24, 1995. Aguilera reported for duty as a probationary police officer on March 27, 1995. Two other new police officers reported for duty as probationary officers at the same time. Shortly after Aguilera began his field training, Police Chief Moore retired, and Peter Fee became the Chief of Police for the Village.

Aguilera experienced difficulties during his field training. The three field training officers that worked with Aguilera, Officers Murray, Peters and Peers, expressed some positive feedback about Aguilera, most notably in his attitude and work ethic. However, the field training officer reports expressed great concern about progress in certain areas, such as Aguilera's oral and written communication skills, ability to handle stressful situations, radio skills, and navigation skills. Of these claimed deficiencies, Aguilera's communication skills were of the greatest concern, as the reports indicated that Aguilera had difficulty with the English language. Aguilera disputes the conclusions of these reports.

To address Aguilera's perceived communication problems, the Village and Aguilera agreed that Aguilera would take English classes at a local college. Aguilera performed well on the college's

English proficiency exam. In the school setting, Aguilera tested at an advanced level and his pronunciation was good.

At the end of the twelve week field training program, the two officers that started the program with Aguilera graduated, but Aguilera did not. Chief Fee was of the opinion that Aguilera was not sufficiently prepared to become a full time police officer. The Village extended Aguilera's field training program for an additional four months. During this four month period, Aguilera was evaluated by three different officers, Arme, Preston and Nelson, all of whom expressed mixed reviews about Aguilera's performance. Similar to the initial twelve week field training session, the second set of reviewing officers reported that Aguilera's communication skills continued to be a major problem.

Aguilera saw his performance differently. Throughout the field training, Aguilera claims that he was subject to discriminatory remarks from other officers. Aguilera asserts that numerous officers made derogatory remarks about Aguilera's ability to speak English, and other officers often told him his English was awful, that he could not speak, and he could not write. Aguilera also says that an officer embarrassed him by ordering him to speak into a loudspeaker, and by ordering him to write reports in a certain manner and then ordering him to re-write the reports in a different manner. Aguilera says that certain officers said he was not American enough, that he should become a police officer where there were more minorities, and that he should move to an Hispanic neighborhood and open a coffee shop. Aguilera did not complain to anyone about this alleged harassment.

In July of 1995, the Village had a mandatory meeting for police officers that Aguilera failed to attend. This resulted in a verbal warning for Aguilera, which was accompanied by a written verification of the warning.

Aguilera's tenure as a probationary officer with the Village came to an end in October 1995. Early in the month, Aguilera missed another mandatory meeting for police officers. Aguilera claimed that he did not know about the meeting, and no one told him about it or told him to attend. Also during early October, Aguilera had on-going difficulties in his relationship with his girlfriend, with whom Aguilera shared an apartment in Tinley Park, Illinois. Tinley Park police responded to domestic problems at Aguilera's apartment at least three times during October 1995. On one of these occasions, Tinley Park police took Aguilera into custody after he made threatening motions with his service weapon towards his girlfriend.

On October 12, 1995, Police Chief Fee asked for Aguilera's resignation. Around the same time, Chief Fee recommended that the Board of Fire and Police Commissioners terminate Aguilera's employment with the Village. Aguilera did not tender a resignation, and was terminated effective October 20, 1995.

On August 2, 2001,[1] Aguilera filed this suit, claiming that he was subject to a hostile work environment and that the Village terminated his employment because of his race/national origin. The Village now moves for summary judgment, arguing that there is no evidence of a hostile work environment, Aguilera cannot demonstrate a *prima facie* case of disparate treatment, and there is no evidence that the decision to terminate Aguilera was a pretext for illegal discrimination. The Village's motion is fully briefed and ripe for ruling.

## II. DISCUSSION

### A. Standards for summary judgment

---

[1] Aguilera alleges that he filed his E.E.O.C. charge on November 29, 1995, and received his right to sue letter on May 23, 2001. The parties have not made an issue of the timeliness of Aguilera's suit.

4

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High School District No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999); see also Shank v. William R. Hague, Inc., 192 F.3d 675, 682 (7th Cir. 1999) (stating that a party opposing summary judgment must present "what evidence it has that would convince a trier of fact to accept its version of events"). A defendant is entitled to put the plaintiff to his proofs and demand a showing of the evidence. See e.g. Navarro v. Fuji Heavy Industries, Ltd., 117 F.3d 1027, 1030 (7th Cir. 1997). If the plaintiff fails to come up with the required proof, the defendant is entitled to summary judgment. See id. It bears repeating that the plaintiff must present evidence, rather than speculation and conclusions without factual support. See Rand v. CF Industries, Inc., 42 F.3d 1139, 1146-47 (7th Cir. 1994).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment. See Fed. R. Civ. P. 56(c), see also, Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir.1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962), see also, First Nat'l. Bank of Arizona v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc.,

77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Parties must comply with Local Rule 56.1 when submitting materials in support of, or in opposition to, a motion for summary judgment. See Brasic v. Heinemann's Inc., 121 F.3d 281, 284 (7th Cir. 1997). The rule streamlines summary judgment proceedings by requiring litigants to provide concise statements of fact with precise record citations. See Local Rule 56.1(a)(3). In the event of a factual dispute, the opposing party must provide a precise record citation supporting the denial. See Local Rule 56.1(b). Failure to provide the proper record citations for a denial will result in the court deeming a statement of fact as uncontested. Id.; see also Salvadori v. Franklin Sch. Dist., 293 F.3d 989, 992 (7th Cir. 2002) (discussing the analogous rule in the Eastern District of Wisconsin); Huff v. Uarco, Inc., 122 F.3d 374, 382 (7th Cir. 1997); Brasic, 121 F.3d at 284; Flaherty v. Gas Research Institute, 31 F.3d 451, 453 (7th Cir. 1994); Oates v. Discovery Zone, 116 F.3d 1161, 1165, 1167 (7th Cir. 1997); Bell, Boyd & Lloyd v. Tapy, 896 F.2d 1101, 1102 (7th Cir. 1990); Herman v. Chicago, 870 F.2d 400, 404 (7th Cir. 1989). Aguilera denies several of the Village's factual averments, but fails to provide any record citation supporting his denial. (See R. 23, Pl.'s Resp., ¶¶ 22, 34, 35.) Accordingly, the court deems those statements admitted to the extent they are supported by the Village's record citation.

**B. Hostile Work Environment:**

Title VII prohibits employers from permitting a work environment that is hostile to employees because of their inclusion in a protected class, such as race, gender, or national origin. See generally Cerros v. Steel Tech., Inc., 288 F.3d 1040, 1045 (7th Cir. 2002); Hilt-Dyson v. City of Chicago, 282 F.3d 456, 462-63 (7th Cir. 2002). A plaintiff bringing a hostile work environment

6

action must demonstrate severe or pervasive harassment based on an immutable characteristic, such as race or gender, and a basis for employer liability. See Cerros, 288 F.3d at 1045. The parties dispute whether Aguilera has evidence that he was subjected to severe or pervasive harassment because of his race or national origin.

In order to be actionable, a hostile work environment must be sufficiently severe or pervasive, so as to alter the conditions of employment. See Gleason v. Mesirow Financial, Inc., 118 F.3d 1134, 1143-44 (7th Cir. 1997) (citing cases). The conduct giving rise to the hostile work environment claim must be both objectively and subjectively offensive. See Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2283 (1998); Murray v. Chicago Transit Authority, 252 F.3d 880, 888-89 (7th Cir. 2001). "'Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.'" Gleason, 118 F.3d at 1143-44 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S. Ct. 367, 370-71 (1993)); see also Quantock v. Shared Marketing Servs., Inc., – F.3d –, 2002 WL 31770494, at *3 (7th Cir. Dec. 12, 2002) (quoting Murray, 252 F.3d at 889). The circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Gleason, 118 F.3d at 1143-44 (quoting Harris, 114 S. Ct. at 371). Under this standard, a single incident of severely offensive conduct is a violation of Title VII, as are repeated instances of less offensive conduct. See Smith v. Sheahan, 189 F.3d 529, 533-34 (7th Cir. 1999) (holding that a single severe incident of sex-based harassment was sufficient to state a Title VII claim); see also Burlington Industries, Inc. v. Ellerth, 118 S. Ct. 2257, 2262-63 (1998) (outlining repeated instances of offensive conduct that was actionable as a hostile work environment).

At the same time, not all workplace unpleasantries give rise to liability under federal civil rights laws, which do not guarantee a perfect work environment. See Hilt-Dyson, 282 F.3d at 463; Vore v. Indiana Bell Telephone Co., Inc., 32 F.3d 1161, 1162 (7th Cir. 1994). On several occasions, the Seventh Circuit has explained that a workplace must be "hellish" before it is actionable as a hostile environment. See Logan v. Kautex N. Am., 259 F.3d 635, 641 (7th Cir. 2001) (quoting Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997) (in turn citing Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)). And, any harassment must be based on the plaintiff's protected status, such as race, national origin, or gender. See e.g. Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345 (7th Cir. 1999) (noting that the complained of conduct must have a racial purpose to be a violation of Title VII); Vore, 32 F.3d at 1163-64 (affirming grant of summary judgment in favor of Title VII defendant where there was no evidence of a hostile work environment based on racial animus).

Aguilera lists several incidents that he claims constitute a hostile work environment. The court assumes for the purpose of this motion that Aguilera found these comments subjectively offensive. Aguilera's claims fall into two general categories of hostility: commentary about his English skills and commentary about his Hispanic heritage.

1. **English Skills:**

Aguilera complains that: (1) other officers and Chief Fee told Aguilera his English was bad and his oral and written communication skills were poor; (2) an officer ordered Aguilera to speak into a loudspeaker; and (3) an officer ordered Aguilera to write reports in a certain manner and then ordered him to re-write the reports in a different manner.

8

As noted above, the court cannot divorce alleged harassment from the context in which it occurred. See Hilt-Dyson, 282 F.3d at 464. Here, the comments about Aguilera's English skills came during Aguilera's term as a probationary officer. The two sets of officers assigned to evaluate Aguilera's performance noted many positive attributes, but consistently noted that Aguilera had difficulties with the English language. Aguilera's allegations of harassment focus not on the evaluators, but on other officers and Chief Fee commenting that Aguilera's English skills were bad. That these officers had negative comments Aguilera's English skills did not automatically render his work environment hostile or abusive. Aguilera fails to demonstrate that the comments about his English skills were threatening, abusive, or made to harass Aguilera about his ethnicity. For example, Aguilera does not claim that other officers used profane language or racial/ethnic epithets in Aguilera's presence or in reference to him. Compare Cerros, 288 F.3d at 1046-47. All that Aguilera puts forth are assertions that other officers and Chief Fee said Aguilera's English was bad and he was a bad communicator. Objectively, that is not enough to demonstrate a hostile work environment.

Aguilera also asserts that an officer ordered Aguilera to speak into a loudspeaker. Aguilera then concludes, without supporting evidence, that this officer did so to embarrass Aguilera and get pleasure at Aguilera's expense. This case is at the summary judgment stage, where Aguilera has the burden of putting forth evidence, not self-serving conclusions. See Rand, 42 F.3d at 1146-47. The only objective evidence before the court is that an officer ordered Aguilera to speak into a loudspeaker. Aguilera fails to put this event into context, and similarly fails to present evidence that the incident was intended to harass Aguilera because of his race or national origin.

9

Next, Aguilera alleges that an officer ordered Aguilera to prepare reports in a certain manner, and then ordered Aguilera to re-write the reports in a different manner. Report writing is a necessary requirement of law enforcement. This minor issue does not rise to the hellish level of harassment that is necessary. Moreover, Aguilera presents no evidence that this sequence of events was motivated out of a desire to harass Aguilera because he is Hispanic.

### 2. Hispanic Heritage:

Aguilera alleges that fellow officers made comments that were derogatory of Aguilera's ethnicity, including: (1) an officer twice telling Aguilera he was not American enough; (2) an officer telling Aguilera that he should become a police officer where there were more minorities; and (3) an officer telling Aguilera that he should move to a Hispanic neighborhood and open a coffee shop.

Taken in the light most favorable to Aguilera, these comments were insensitive and crude. But, Aguilera fails to demonstrate that these comments were threatening, abusive, or made with the intention of harassing Aguilera about his heritage. The comments are in the nature of offhand remarks or stray comments that generally do not rise to the level of a hostile environment. Again, this is not a situation where Aguilera was subjected to racial or ethnic epithets or overt displays of race based hostility. Compare Cerros, 288 F.3d at 1046 (analyzing an "appalling litany of misconduct" that included pervasive vile epithets and graffiti aimed at the plaintiff, as well as references to the KKK and "White Power"). Instead, on no more than four occasions over a seven month period, fellow officers made off-color remarks about Aguilera's heritage. These remarks do not rise to the level of an actionable hostile working environment.

Even taking all of the allegations together, Aguilera fails to demonstrate that his tenure as a probationary officer was the type of hellish work environment prohibited by Title VII. There is

no evidence that any of the remarks or actions that Aguilera perceived as hostile were motivated by Aguilera's race or national origin. Similarly, there is no evidence that the terms and conditions of Aguilera's employment were altered by the allegedly hostile comments and actions.

**C.    Disparate Treatment:**

Next, Aguilera contends that the Village discriminated against him when it terminated his employment. To succeed on this claim, Aguilera bears the ultimate burden of proving that the Village terminated him because of his race and/or national origin. See Cianci v. Pettibone Corp., 152 F.3d 723, 726 (7th Cir. 1998). Aguilera can prove his case by presenting either direct evidence of discrimination, or indirectly through the burden shifting analysis of McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). See Maldanado v. U.S. Bank, 186 F.3d 759, 762-64 (7th Cir. 1999) see also Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1088 (7th Cir. 2000) (analyzing the McDonnell-Douglas test in an ADA/age discrimination case). Direct evidence of discrimination is "smoking gun" evidence, such as "We fired you because of your race and/or national origin." Robin, 200 F.3d at 1088. Because such evidence is rare, a plaintiff can also proceed using indirect evidence of discrimination and the McDonnell-Douglas burden shifting approach. Robin, 200 F.3d at 1088; Maldanado, 186 U.S. 762-64.

A plaintiff using the burden shifting method raises a presumption of discrimination by proving his prima facie case by a preponderance of the evidence. See Robin, 200 F.3d at 1088. The burden then shifts to the employer to articulate a legitimate non-discriminatory reason for its action. Id. If the employer does so, the presumption of discrimination disappears, and the plaintiff must prove by a preponderance of the evidence that the employer's stated reasons are a pretext for intentional discrimination. Id. As the Seventh Circuit pointed out in Robin, the burden shifting

11

framework is not a rigid analysis, but is tool for the court to determine the need for a trial. Robin, 200 F.3d at 1088-89. If a plaintiff does not have direct or indirect evidence that is conclusive by itself, the plaintiff may be able to defeat summary judgment by composing a convincing mosaic of direct and indirect evidence of discrimination. Id.; Piraino, 84 F.3d at 274.

Aguilera chooses to proceed under the indirect McDonnell-Douglas burden shifting approach. Therefore, Aguilera must present factual evidence demonstrating that: (1) he was a member of a protected class; (2) he was meeting the Village's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the Village treated similarly situated non-Hispanic officers more favorably than it treated Aguilera. Peters v. Renaissance Hotel Oper. Co., 307 F.3d 535, 545 (7th Cir. 2002); Robin, 200 F.3d at 1090. The parties dispute two elements of Aguilera's prima facie case: his job performance and whether similarly situated non-Hispanics were treated more favorably. Aguilera fails to carry his burden on either element.

**1. Job Performance:**

The Village cited three causes for Aguilera's termination: poor communication skills, the two missed meetings, and Aguilera's domestic dispute. Aguilera contends that he performed adequately during his probationary period, and that the reason he did not successfully complete the field training program was that the Village did not afford him to opportunity to do so. Aguilera's primary argument is that the field training officers who submitted performance evaluations were the same people that harassed him.

When an employer terminates an employee due to poor performance, an inference of discrimination may exist if the decision maker had a discriminatory animus or relied on information supplied by someone with such an animus. See Hall v. Gary Comm. Sch. Corp., 298 F.3d 672, 676

(7th Cir. 2002); Maarouf v. Walker Mfg. Co., 210 F.3d 750, 754 (7th Cir. 2000) (citing Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1400 (7th Cir. 1997)); Hunt v. City of Markham, Ill., 219 F.3d 649, 652-53 (7th Cir. 2000). This is particularly so when the decision maker or source of information for the decision maker expresses discriminatory feelings around the time of, and in reference to, the adverse employment action. See Hunt, 219 F.3d at 652-53. But, if there is corroboration of the employee's poor performance that is independent of any discriminatory animus, then the inference of discrimination lessens and will not defeat summary judgment. See Hall, 298 F.3d at 676; Maarouf, 210 F.3d at 754. This independent corroboration can come from persons who do not hold discriminatory beliefs, admissions of employee/plaintiff, or objectively verifiable data. See Hall, 298 F.3d at 676; Maarouf, 210 F.3d at 754-55.

Six officers, Murray, Peters, Peers, Arme, Preston and Nelson, acted as Aguilera's field training officers. Of these, only Murray made any type of comment that could be construed as evidence of a discriminatory animus against Aguilera because of Aguilera's race or national origin.[2] All six officers commented that Aguilera's language and communication skills were poor, but those comments are not evidence of discriminatory animus. Indeed, there is no evidence that these negative comments were motivated by Aguilera's ethnicity or were prevarications. Moreover, all six officers also related positive comments about portions of Aguilera's performance. And, while Chief Fee also made negative comments about Aguilera's English skills, there is no evidence that these comments were motivated by Aguilera's race or were prevarications. In sum, Aguilera fails to demonstrate that the negative performance reviews were the result of discriminatory animus.

---

[2]Murray allegedly told Aguilera that he was not American enough, and that he should go to a Hispanic neighborhood and open a coffee shop.

Moreover, Aguilera admits that he missed the two mandatory meetings and was involved in a domestic dispute where he used his service weapon to threaten his girlfriend. Aguilera argues that he was not informed about the meetings and that the domestic dispute evidence is not relevant, but these arguments are without merit. An employer can expect that employees will attend scheduled meetings without being reminded to do so. And, as discussed in greater detail below, Aguilera's actions during his domestic dispute were quite relevant to the Village's decision to terminate his employment. Thus, Aguilera fails to prove this element of his *prima facie* case, and the Village is entitled to summary judgment.

**2. Similarly Situated:**

Aguilera must also demonstrate that the Village treated similarly situated non-Hispanic officer more favorably than it did Aguilera. See Radue v. Kimberly-Clark Corp., 219 F.3d 612, 618 (7th Cir. 2000). To determine whether there are similarly situated employees, the court must examine the facts and context of the case. See id. at 617. The other employees need not be identical to Aguilera, but there must be a substantial similarity so as to create the inference that discriminatory intent could be the reason for different treatment. Id.; see also Greer v. Board of Educ. of City of Chicago, 267 F.3d 723, 728 (7th Cir. 2001) (noting that the similarity must be the same in all material respects); Spath v. Hayes Wheels Intl., 211 F.3d 392, 397 (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (7th Cir. 1992)). Factors the court should examine are whether the same decision makers, standards, and conduct were involved. See Radue, 219 F.3d at 617-18. In this case, Aguilera admits that there are no similarly situated non-Hispanics who had the same difficulties as Aguilera but received better treatment. Absent such evidence, Aguilera fails to demonstrate an essential element of his *prima facie* case.

### 3. Pretext:

Out of an abundance of caution, the court also analyzes this case on the issue of pretext. Pretext means a lie. Aguilera must demonstrate that the Village's stated reasons for his termination were phony or completely lacking a factual basis. Paluck v. Gooding Rubber Co., 221 F.3d 1003, 1012-13 (7th Cir. 2000); Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000). Pretext will not be found in an ill advised, incorrect, or even stupid decision. See Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir. 2000). The court does not sit as a super-personnel agency to review the wisdom of an employer's action. Id. Instead, the court examines the record to see if there is evidence that the employer is lying to cover up illegal discrimination. Paluck, 221 F.3d at 1012-13; Jordan, 205 F.3d at 343.

The court need go no further than Aguilera's threatening use of his weapon towards his girlfriend during a domestic dispute. Municipalities and their police departments have the authority, if not the duty, to make sure that their police officers are fit for the job. See Krocka v. City of Chicago, 203 F.3d 507, 515 (7th Cir. 2000) (citing Duda v. Franklin Park Pub. Sch. Dist. 84, 133 F.3d 1054, 1060 (7th Cir. 1998)); cf. Merheb v. Illinois St. Toll Hwy. Auth., 267 F.3d 710, 714 (7th Cir. 2001) (approving a supervisor's decision to terminate an employee that engaged in threatening behavior). Aguilera's actions were extremely serious and are intolerable for a police officer. The Village was amply justified in terminating Aguilera's probationary employment after he acted as he did. And, Aguilera concedes that these events occurred. He argues that the domestic dispute is irrelevant to his suit, but that argument is without merit. Aguilera's actions, at the very least, demonstrate extremely poor judgment on his part. The Village was well within the bounds of discretion to terminate his employment.

### III. CONCLUSION

For the foregoing reasons, the court grants summary judgment in favor of Defendant, the Village of Hazelcrest.

IT IS SO ORDERED.

ENTER: *Charles R. Norgle*
CHARLES RONALD NORGLE, SR. Judge
United States District Court

DATED: 12-18-02